UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

ELIJAH HOLLMAN,

**MEMORANDUM & ORDER**

**08-CV-1417 (NGG)**

Plaintiff,

-against-

WARDEN CAMERON LINDSAY, KEVIN
PAGE, NICOLE WALLER, DR. PARRY
HESS, JESSIE MARIE ANDERSON,
LIEUTENANT KRISTIE BARTLETT, AND
LIEUTENANT BRIAN GUIMOND,

Defendants.
---------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Plaintiff Elijah Hollman ("Plaintiff" or "Hollman") was formerly an inmate at the

Brooklyn Metropolitan Detention Center ("MDC") and is currently incarcerated at a federal

prison in Lisbon, Ohio. In his Complaint, Hollman pleads two causes of action against MDC

employees under Bivens v. Six Unknown Named Agents of the Narcotic Bureau, 403 U.S. 388

(1971). Hollman sues Defendants in both their official and individual capacities, seeking

compensatory and punitive damages totaling $140,000. (Compl. (Docket Entry #1) ¶ 16,

caption.)

First, Hollman claims that Defendants Dr. Perry Hess ("Dr. Hess" or "Hess") and Warden

Cameron Lindsay ("Lindsay") deprived him of his right to participate in the Brooklyn Detention

Center's Residential Drug Abuse Program ("RDAP"). Hollman alleges that Dr. Hess

"intentionally refused to acknowledge a court generated document that indicated that Plaintiff

continued to abuse drug [sic] even to the date of guilty plea in the federal court" and Defendant

1

Lindsay then intentionally endorsed **Dr. Hess's** report "in careless disregard for plaintiff's rights." (Id. ¶ 12.) Hollman further alleges that Defendants **Kevin** Page ("Page"), Nicole Waller ("Waller"), and Jessie Marie Anderson ("Anderson") deprived him of his right to rehabilitation and participation in RDAP by concealing information about the success of his appeal of the decision denying his right to rehabilitation. (Id. ¶ 13.)

For his second cause of action, Hollman claims that Defendants **Lieutenant Kristie Bartlett** ("Bartlett") and Lieutenant **Brian Guimond** ("Guimond") deprived him of his right to be free from restraint while inside prison by placing him in administrative detention without cause. (Id. ¶ 14.) Hollman also alleges that Defendants Bartlett and Guimond colluded to deprive him of his right to rehabilitation. (Id.)

Defendants move to dismiss Hollman's Complaint under Federal Rule of Civil Procedure 12(b)(1), claiming that Hollman's official-capacity <u>Bivens</u> claims are, as a matter of law, deemed to be brought against the United States and are thus barred by sovereign immunity. (See Defendants' Memorandum of Law Docket Entry #27 ("Defs. Mem.") 1.) To the extent that Hollman's claims are stated against Defendants in their individual capacities, Defendants move to dismiss, or for summary judgment, because: (1) Hollman did not exhaust available administrative remedies for his second cause of action as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e ("PLRA"); (2) Hollman fails to state a claim upon which relief may be granted; (3) none of the Defendants were personally involved in any constitutional violation; and (4) all Defendants are entitled to qualified immunity. (See Defs. Mem. 2.)

## II.    Background

The following facts are undisputed unless otherwise noted.[1] On January 16, 2004,

Hollman pleaded guilty to distribution and possession with intent to distribute 50 grams or more

of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(a)(1)(A)(III). (See Defs. Mem.

2.) Because Hollman tested positive for cocaine on the morning of his January 16th plea, the

District Judge Thomas C. Platt later retook Hollman's plea and sentenced him on June 13, 2005.

(See id.; Johnson Decl. (Docket Entry #27) ¶ 53 & Ex. 17, at 4.) Hollman began serving his

sentence on August 1, 2005 and was transferred to the MDC on October 13, 2005. (See Defs.

Rule 56.1 Stmt. (Docket Entry #27) ¶ 1.) The record does not state where Hollman was

imprisoned between August 1, 2005 and October 30, 2005.

### A.    Residential Drug Treatment Program Eligibility

Hollman began a 40-hour Drug Abuse Education Course ("DAEC") in the MDC on

January 17, 2006. (See Defs. Rule 56.1 Stmt. ¶ 11; Johnson Decl. ¶ 15 & Ex. 2.) He completed

the course on August 1, 2006. (See id.) Federal inmates may be required to participate in DAEC

when

> ... it is determined by unit and/or drug abuse treatment staff through a
> combination of interview and file review that: (i) There is evidence in the
> Presentence Investigation that alcohol or other drug use contributed to the
> commission of the instant offense; (ii) Alcohol or other drug use was a reason for
> violation either of supervised release, including Parole, or BOP community status
> (CCC placement) for which the inmate is now incarcerated; or (iii) The inmate

---

[1] While Plaintiff opposes Defendants' Motion for Summary Judgment, he does not dispute the majority of facts set forth in Defendants' Rule 56.1 Statement. Pursuant to Local Rule 56.2, Defendants provided Plaintiff with notice of the consequences of failing to comply with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, and included copies of those rules. (See Notice to Pro Se Litigant Opposing Motion to Dismiss or Motion for Summary Judgment Pursuant to Local Rules 12.1 and 56.2 (Docket Entry #27 ("Rule 56.2 Notice").) Plaintiff did not submit a Rule 56.1 Statement or a response to Defendants' 56.1 Statement. Since Plaintiff is pro se, the court has nonetheless reviewed the record submitted by the parties to determine whether there are disputed issues of material fact. See Melendez v. DeVry Corp., No. 03-CV-1029 (NGG) (LB), 2005 WL 3184277, at *2 (E.D.N.Y. Nov. 29, 2005). The court will deem admitted only those facts in Defendants' Rule 56.1 Statement that are supported by admissible evidence and are not controverted by admissible evidence in the record.

was recommended for drug programming during incarceration by the sentencing judge.

(See Defs. Rule 56.1 Stmt. ¶ 12; Johnson Decl. ¶ 16 & Ex. 3 ("BOP Program Stmt.") § 3.2.)

Hollman's participation in the DAEC was mandatory because Judge Platt recommended that

Hollman be permitted to attend a drug treatment program. (See Defs. Rule 56.1 Stmt. ¶ 14;

Johnson Decl. ¶ 18.)

After completing the DAEC, Hollman enrolled in the Bureau of Prison's Non-Residential

Drug Abuse Treatment Program ("DAP") on or about August 8, 2006. (See Defs. Rule 56.1

Stmt. ¶ 16; Johnson Decl. ¶ 20 & Ex. 4.) To be eligible for the program, an inmate must satisfy

three requirements:

(1) The inmate must have a verifiable documented drug abuse problem.

(2) The inmate must have no serious mental impairment which would substantially interfere with or preclude full participation in the program.

(3) The inmate must sign an agreement acknowledging his/her program responsibility.

(See BOP Program Stmt. § 4.2) If an inmate is eligible, participation in the DAP is voluntary.

(See id.)

While participating in DAP, Hollman applied to the Residential Drug Abuse Program

("RDAP"). (See Defs. Rule 56.1 Stmt. ¶ 21; Johnson Decl. ¶ 25.) Successful completion of

RDAP may entitle an inmate to a sentence reduction of up to one year. See 18 U.S.C §

3621(e)(2)(B). For this reason, the admissions criteria for RDAP are more stringent than for

either DAEC or DAP. (See Defs. Rule 56.1 Stmt. ¶ 24; Johnson Decl. ¶ 28.) Eligible inmates

must satisfy the following criteria: (i) "[t]he inmate must have a verifiable documented drug

abuse problem;" (ii) "[t]he inmate must have no serious mental impairment which would

substantially interfere with or preclude full participation in the program;" (iii) "[t]he inmate must

sign an agreement acknowledging his/her program responsibility;" (iv) "[o]rdinarily, the inmate must be within thirty-six months of release;" and (v) "[t]he security level of the residential program must be appropriate for the inmate." (See BOP Program Stmt. § 5.4.1.)

DAP and RDAP both require eligible inmates to have a "verifiable documented drug abuse problem." While DAP's eligibility criteria do not articulate the standard for this requirement, RDAP's eligibility criteria provide guidance. RDAP requires drug abuse program staff to conduct an eligibility interview, followed by a review of pertinent documents in the inmate's central file to corroborate self-reported information. (See id.) Eligible inmates must meet the diagnostic criteria for substance abuse or dependence indicated in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"). (See id.) The Presentence Investigation, or other similar documents in the inmate's central file, must also provide verification supporting the diagnosis. (See id.)

The DSM-IV defines both "substance abuse" and "substance dependence" with reference to a twelve-month period. (See Johnson Decl. Ex. 8 (DSM-IV) at 197-98.) For the purposes of determining RDAP eligibility, Bureau of Prison drug abuse coordinators consider an inmate's documented and verifiable drug abuse for the twelve months immediately preceding incarceration. (See Defs. Rule 56.1 Stmt. ¶ 29; Johnson Decl. ¶ 33.) If an inmate has no documented and verifiable drug abuse during the twelve-month period, then he or she will not be eligible for RDAP. (See Defs. Rule 56.1 Stmt. ¶ 30; Johnson Decl. ¶ 34) Placement in RDAP is determined by a Drug Abuse Treatment Coordinator. (See BOP Program Stmt. § 5.4.2.)

Erin Rogers, a Drug Abuse Treatment Specialist at MDC, interviewed Hollman on August 15, 2006 to determine his RDAP eligibility. (See Defs. Rule 56.1 Stmt. ¶ 21; Johnson Decl. ¶ 25 & Ex. 7.) During this interview, Hollman stated that he used cocaine daily and

5

consumed alcohol more than once a week during the twelve months before his imprisonment. (See Defs. Rule 56.1 Stmt. ¶ 32; Johnson Decl. ¶ 36 & Ex. 7.)

Hollman's Presentence Investigation Report contradicted his interview statements about cocaine and alcohol use. The Presentence Report indicated that Hollman (i) consumed three to four mixed drinks once a week; (ii) began smoking marijuana on a daily basis at the age of 15, but last used marijuana eight years ago; and, (iii) used cocaine two to three times a week when he was 20 years old, but stopped using cocaine on a regular basis three years ago, with the last occasion just prior to entering his guilty plea in January 2004. (See Johnson Decl., Ex. 9 ¶¶ 104-106.) Because Hollman's Presentence Report did not support his interview statements, Ms. Rogers recommended that Hollman's RDAP application be denied. (See Defs. Rule 56.1 Stmt. ¶ 35; Johnson Decl. ¶ 39 & Ex. 7, at 5.)

On January 25, 2007, MDC's Drug Abuse Treatment Coordinator, Dr. Hess, officially notified Hollman in writing that he was not qualified to participate in RDAP.[2] (Johnson Decl., Ex. 10.) At this time, Hollman continued to participate in DAP, but he was expelled from the program on March 8, 2007 for not complying with the program's rules. (See Defs. Rule 56.1

---

[2] Dr. Hess's official notice provided,

> The Drug Abuse Programs Manual requires that Residential Drug Abuse Program (RDAP) participants must have a verifiable, documented drug abuse problem. The standard of evidence is the Pre-Sentence Investigation (PSI), which must list the existence of a drug abuse problem. A drug abuse problem is not indicated if the Pre-sentence Investigation lists no drug use or specifies occasional, infrequent, or other very limited drug use. Your Pre-Sentence Investigation states that your alcohol consumption was limited to 3-4 drinks once per week. Your PSI also states that you stopped using marijuana in 1996 and stopped using cocaine in 2001, except for one occasion in 2004. You were incarcerated on August 1, 2005 and your PSI does not report any regular substance use between the years 2001 and 2005. According to the Diagnostic Statistical Manual IV, your current diagnosis must be based on your drug use during the one year period prior to your incarceration. You PSI does not document a drug use problem during the time period required for a current diagnosis. Consequently you are not eligible for RDAP.

(Johnson Decl., Ex. 10.)

Stmt. ¶ 39; Johnson Decl. ¶ 43 & Ex. 6.) Hollman's noncompliance was based on his failure to turn in homework assignments. (See id.)

Immediately following his expulsion from DAP, Hollman initiated the Bureau of Prisons administrative appeals process challenging Dr. Hess's decision that he was ineligible to participate in RDAP. The Bureau of Prisons has a multi-tiered administrative remedy program allowing a federal inmate to "seek formal review of an issue relating to any aspect of his/her own confinement." 28 C.F.R. § 542.10(a). An inmate must first report an issue informally to prison staff, giving the staff an opportunity to resolve the issue before the inmate takes further action. See 28 C.F.R. § 542.13(a). If the inmate is not satisfied with the staff's resolution, the inmate can pursue a three-tier administrative process. See 28 C.F.R. §§ 542.10-542.16. At the first tier, an inmate must submit an Administrative Remedy Request to the Warden (Form BP-9). See 28 C.F.R. § 542.14(a). If the inmate is not satisfied with the Warden's response, he or she may submit an appeal (Form BP-10) to the appropriate Regional Director. See 28 C.F.R. § 542.15(a). Finally, a dissatisfied inmate may submit an appeal (Form BP-11) to the General Counsel. Id.

On March 8, 2009, Hollman filed an Inmate Request for Informal Resolution, stating that he "would like to be considered for the 500 h.r. R.D.A.P Program," because his "J.C. [Judgment of Conviction] states that [he] ha[s] a drug problem. . . ." (See Defs. Rule 56.1 Stmt. ¶ 40; Johnson Decl. ¶ 44 & Ex. 13.) Defendants Anderson and Page responded to the request by referring Hollman to Dr. Hess's RDAP rejection notice. (See Defs. Rule 56.1 Stmt. ¶ 41; Johnson Decl. ¶ 45 & Ex. 13.)

Hollman then submitted a Form BP-9, Request for Administrative Remedy, dated March 23, 2009 to Warden Lindsay, stating that "I am being denied the voluntarily [sic] 500 hr. Drug education Program. My Judgment and Commitment clearly states the recomendation [sic] but

7

the staff at M.D.C. brooklyn say I don't fit the criteria. . . ." (See Defs. Rule 56.1 Stmt. ¶ 42; Johnson Decl. ¶ 46 & Ex. 14.) Warden Lindsay rejected Hollman's request by letter dated April 17, 2009 stating, inter alia, that "[a]lthough the recommendation on your Judgment and Commitment was considered, based on your limited drug use one year prior to your incarceration, you are not eligible for the program according to the Bureau of Prison's policy." (See Defs. Rule 56.1 Stmt. ¶ 43; Johnson Decl. ¶ 47 & Ex. 15.) Warden Lindsay's letter quoted relevant parts of Dr. Hess's original rejection notice to Hollman. (See id.)

On or about April 27, 2007, Hollman appealed Warden Lindsay's decision by submitting a Form BP-10 to the Bureau of Prison's Northeast Regional Office. (See Defs. Rule 56.1 Stmt. ¶ 45; Johnson Decl. ¶ 49 & Ex. 12.) The Regional Director rejected Hollman's appeal by letter dated May 22, 2007, stating in pertinent part, "Your [Pre-Sentence Report] does not support your self-report of a substance use disorder during this period. . . . Additionally, your completion of Drug Education should satisfy the Judge's recommendation that you receive treatment." (See Johnson Decl., Ex. 16.)

On or about June 19, 2007, Hollman submitted a Central Office Administrative Remedy Appeal, Form BP-11. (See Defs. Rule 56.1 Stmt. ¶ 47; Johnson Decl. ¶ 51 & Ex. 17.) In his appeal, Hollman acknowledged that his Pre-Sentence Report only reported regular cocaine use prior to 2001, but claimed—for the first time in his appeals submissions—that the Report is an incomplete account of his cocaine use for the twelve-month period before his imprisonment because his Pre-Sentence interview was taken on February 11, 2004 before both his sentencing on June 13, 2005 and his imprisonment on September 30, 2005.[3] (See Johnson Decl., Ex. 17.) Hollman stated that it was during this period—the time between his Pre-Sentence Report

---

[3] Plaintiff's appeal states that he began his incarceration on September 30, 2005. (See Johnson Decl., Ex. 17.) However, Defendants' submissions state that Hollman began his incarceration on August 1, 2005. (See Defs. Rule 56.1 Stmt. ¶ 1.)

Interview and his sentencing—that he suffered "a full blown cocaine relapse." (See id.)
Hollman claimed that his relapse was supported and verifiable in written documentation because
he had to replead after testing positive for cocaine at his first allocution. (See id.) In response,
the Administrator for National Inmate Appeals granted Hollman's appeal on February 4, 2008,
stating, inter alia, that "your appeal is being returned to the institution for appropriate action."
(See Johnson Decl., Ex. 19.)

On January 30, 2008, Hollman left MDC Brooklyn for eventual transfer to Elkton
Federal Correctional Institution ("FCI Elkton") in Lisbon, Ohio. (See Defs. Rule 56.1 Stmt. ¶ 2;
Johnson Decl. ¶ 6 & Ex. 1.) Hollman arrived at FCI Elkton on February 12, 2008, where he is
currently incarcerated. (See Defs. Rule 56.1 Stmt. ¶ 3; Johnson Decl. ¶ 7 & Ex. 1.) The record
does not indicate why Hollman was transferred to FCI Elkton. Because of Hollman's transfer,
the Administrator for National Inmate Appeals sent a memo, dated February 4, 2008, to the
Warden of FCI Elkton explaining that Hollman's appeal was being remanded and that FCI
Elkton should conduct a new RDAP Eligibility Interview.[4] (See Defs. Rule 56.1 Stmt. ¶ 56-57;
Johnson Decl. ¶ 60-61 & Ex. 20.)

A drug specialist at FCI Elkton interviewed Hollman for RDAP eligibility on March 28,
2008. (See Defs. Rule 56.1 Stmt. ¶ 58; Johnson Decl. ¶ 62 & Ex. 21.) In that interview,
Hollman claimed to have abused alcohol every day, used marijuana six times per week, and used
cocaine three times per day in the twelve months before his incarceration. (See Defs. Rule 56.1
Stmt. ¶ 63; Johnson Decl., Ex. 21.) On April 7, 2008, FCI Elkton's Drug Abuse Coordinator
formally rejected Hollman's renewed RDAP application because Hollman's "PSI does not

---

[4] Hollman claims that the Central Office in Washington, DC granted his requested appeal on July 17, 2007 and that
Defendants conspired to keep the information from Hollman until February 8, 2008. (Compl. ¶ 10; Pl. Mem. 10.)
This contention is not supported by the record. The decision granting Hollman's appeal is dated February 4, 2008.
(See Johnson Decl., Exs. 19-20.)

contain sufficient documentation to support the diagnosis of substance abuse or dependence within the required time frame." (See Defs. Rule 56.1 Stmt. ¶ 62; Johnson Decl. ¶ 66 & Ex. 23.) Hollman has not taken further administrative action pursuing his eligibility for the RDAP program at FCI Elkton. (See Defs. Rule 56.1 Stmt. ¶ 63; Johnson Decl. ¶ 67.)

### B. Administrative Segregation

On September 6, 2007, Hollman was transferred to MDC Brooklyn's Special Housing Unit for administrative detention, pending an investigation into whether he violated Bureau of Prison regulations. (See Defs. Rule 56.1 Stmt. ¶ 64; Johnson Decl. ¶ 68 & Ex. 24.) Defendants Bartlett and Page authorized Hollman's transfer to the Special Housing Unit. (See Defs. Rule 56.1 Stmt. ¶ 64; Johnson Decl. ¶ 69 & Ex. 24.) Hollman was later released from the unit on September 19, 2007. (See Defs. Rule 56.1 Stmt. ¶ 66; Johnson Decl. ¶ 70 & Ex. 25.) Defendants' only submission regarding this detention is an administrative detention order stating that Hollman was placed in administrative detention pending investigation into a violation of Bureau of Prisons regulations. (See Johnson Decl. ¶ 68 & Ex. 24.) The record does not provide any further information about the violation, the investigation or its outcome. Nor does the record indicate why Hollman was released on September 19.

Hollman was again placed in administrative detention on October 25, 2007 when another inmate reported that Hollman physically threatened him. (See Defs. Rule 56.1 Stmt. ¶ 67; Johnson Decl. ¶ 71.) After an investigation, Special Investigative Services concluded that the two inmates should be separated from each other and that they would both be taken to the Special Housing Unit pending the outcome of the investigation. (See Defs. Rule 56.1 Stmt. ¶ 69; Johnson Decl. ¶ 73 & Ex. 26.) Thereafter, Hollman remained in the Special Housing Unit until his departure to FCI Elkton on January 30, 2008. (See Defs. Rule 56.1 Stmt. ¶ 70; Johnson Decl.

¶ 74.) However, a redacted copy of a "Report of Investigation" states that Hollman was placed in the Special Housing Unit, but the other inmate "was never placed in Special Housing." (See Defs. Rule 56.1 Stmt. ¶ 68; Johnson Decl. ¶ 72 & Ex. 26, at 4.) The report also indicates that a camera system in the prison captured no events corroborating the other inmate's story and that no other inmates cooperated with the investigation. (See Defs. Rule 56.1 Stmt. ¶ 68; Johnson Decl. ¶ 72 & Ex. 26, at 4.) The Bureau of Prisons has no record of any administrative requests filed by Hollman regarding his placement in the Special Housing Unit. (See Defs. Rule 56.1 Stmt. ¶ 72; Johnson Decl. ¶ 76.)

During both periods in administrative segregation Hollman received regular psychological consultations. (See Defs. Rule 56.1 Stmt. ¶ 71; Johnson Decl. ¶ 75 & Ex. 27.) The findings of a September 11, 2007 psychological consultation state that "Mr. Hollman indicates he demanded to see a psychologist because he is frustrated about his Special Housing placement [and] wanted further information about the SIS investigation which has placed him in Special Housing. . . . He indicated that other staff are unable or unwilling to provide more information. He asked the psychologist to contact SIS and provide him with this information." (Johnson Decl., Ex. 27, at 2.)

Hollman asserts various procedural deficiencies in his continued segregation. Hollman claims that for the first period in administrative segregation "there had been no shots [sic] written, no hearing held, and no reason given." (Plaintiff's Memorandum of Law (Docket Entry #27) ("Pl. Mem.") 8.) Regarding his second segregation, Hollman states that "there was a contrived reason given (but still no shot [sic] and no hearing held). . . ." (Id.)

Hollman further asserts that because Defendants "were hell-bent on making sure plaintiff did not receive the incentive of up to twelve months reduction from his sentence, they conspired

to deny him entry into the rehabilitative program." (Pl. Mem. 5.) On the issue of administrative segregation, Hollman claims that Defendants, "having felt pressured by plaintiff's continued inquiries about his BP 11 and his qualification to participate in the RDAP, colluded with Lieutenant K. Bartlett and other Defendants to place plaintiff in administrative segregation 'pending an SIS investigation,' where no single reason was given to plaintiff as to why he was placed in the 'hole." (Compl. ¶ 7; see Pl. Mem. 2.) Hollman alleges that his second administrative segregation was also for "no apparent reason;" (Compl. ¶ 8) and that it was in "retaliation against an inmate for exercising a constitutional right" (Pl. Mem. 7-8.). Hollman asserts that he was segregated as part of a conspiracy by Defendants to "deter [him] from continuing to fight for [his] rights." (Affidavit of Elijah Hollman (Docket Entry #27) ("Hollman Aff.") ¶ 5.)

Hollman claims that he did not appeal his segregation because Defendants "thwarted plaintiff's efforts to exhaust his administrative remedies" by "thwarting his efforts to obtain a BP 9" Form. (Pl. Mem. 3.) Hollman also claims that Defendants then "began communicating with the personels [sic] at FCI Elkton, Ohio to continue [their] dirty work." (Hollman Aff. ¶ 8.)

Based on the foregoing facts, Hollman asserts two causes of action. First, he claims that Defendants Hess and Lindsay intentionally deprived him of his right to rehabilitation and of his liberty interest in a sentence reduction awarded through successful rehabilitation in the RDAP. As part of his cause of action, Hollman alleges that and Defendants Page, Waller, and Anderson conspired to keep information of his successful appeal from him to continue depriving him of his right to rehabilitation. (Compl. ¶¶ 12-13.) Second, Hollman claims that Defendants Bartlett and Guimond colluded to deprive him of his right to rehabilitation, and in the process, deprived him of his right to be free from restraint while inside prison. (Id. ¶ 14.)

Plaintiff seeks $140,000 in compensatory and punitive damages, $20,000 from each individual Defendant, and any other relief that the court deems appropriate. (Compl. ¶¶ 15-17.)

## II.    STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted). To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ---, 129 S.Ct. 1937 (2009) (quoting Bell Atl. Corp. v. Twombly, 555 U.S. 544, 570 (2007)). A court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" on a motion to dismiss. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). Dismissal under Rule 12(b)(6) on the basis of an affirmative defense is appropriate "if the defense appears on the face of the complaint." Staehr v. Hartford Fin. Servs. Group, 547 F.3d 406, 426 (2d Cir. 2008) (citation omitted).

Because Plaintiff proceeds pro se, his pleadings must be read liberally and interpreted as raising the strongest arguments they suggest. McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

Under Rule 12(d), a motion to dismiss must be converted into a motion for summary judgment when matters outside the pleadings are considered by the court. Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006). "[T]he

conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is strictly enforced and mandatory." Id. (internal quotation marks omitted); see also Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

"Summary judgment is appropriate when the pleadings and admissible evidence proffered to the district court show that there is 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .'" Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (quoting Fed.R.Civ.P. 56(c)). "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Factual disputes that are irrelevant or immaterial to the disposition of a case cannot preclude a grant of summary judgment. See Loria v. Gorman, 306 F.3d 1271, 1282-83 (2d Cir. 2002).

In considering a motion for summary judgment, the court construes the facts "in the light most favorable to the nonmoving party," and draws "all reasonable inferences in its favor." SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009). "[T]he moving party bears the burden of demonstrating the absence of a genuine issue of material fact." Baisch v. Gallina, 346 F.3d 366, 371-72 (2d Cir. 2003) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). In response, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . .'" Jeffreys v. City of New York, 426 F.3d 549,

14

554 (2d Cir. 2005) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

## III.  DISCUSSION

In Bivens v. Six Unknown Named Agents of the Narcotic Bureau, 403 U.S. 388 (1971), the Supreme Court recognized an implied right of action for damages against federal officials alleged to have violated a person's constitutional rights. See Correctional Services Corp. v. Malesko, 534 U.S. 61, 70 (2001). "The purpose of Bivens is to deter individual federal officers from committing constitutional violations." Id. A Bivens action may only be brought against federal officials sued in their individual capacities, and not in their official capacities. See Perez v. Hawk, 302 F. Supp. 2d 9, 18 (E.D.N.Y. 2004) (citing F.D.I.C. v. Meyer, 510 U.S. 471, 485 (2004)). The elements of a Bivens claim are: (1) "that a defendant acted under color of federal law" (2) "to deprive plaintiff of a constitutional right." Tavarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995). "Because the doctrine of respondeat superior does not apply in Bivens actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation." Thomas v. Ashcroft, 470 F.3d 491, 496 (2d Cir. 2006) (internal citations omitted).

### A.  Official Capacity Claims

To the extent that Hollman's claims are against Defendants in their official capacities, they are barred by sovereign immunity. Constitutional tort claims cannot be brought against federal defendants in their official capacities. See Castro v. United States, 34 F.3d 106, 110 (2d Cir. 1994). Sovereign immunity shields "not only the United States but also its agencies and officers when the latter act in their official capacities." Dotson v. Griesa, 398 F.3d 156, 177 (2d Cir. 2005). "[T]he United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts." Castro, 34 F.3d at 110. Because

15

sovereign immunity is jurisdictional in nature, Plaintiff's claims against Defendants in their official capacities must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1). See Hamm v. U.S., 483 F.3d 135, 137 (2d Cir. 2007). Plaintiff's claims against Defendants in their individual capacities are not affected by sovereign immunity.

### B.    Plaintiff's RDAP Claim

Hollman asserts that Defendants violated his rights by not allowing him to participate in RDAP. Hollman claims that this violated, first, his right to rehabilitation and, second, his liberty interest in RDAP's twelve-month sentence reduction incentive. See 18 U.S.C. § 3621(e)(2)(B). Both of these theories fail to state constitutional violations.

At the threshold, Defendants concede that Hollman exhausted his administrative remedies regarding his RDAP claim at MDC Brooklyn.[5] Defendants' concession is consistent with evidence of Hollman's appeals in the record showing that Hollman has complied with the Prison Litigation Reform Act ("PLRA") by exhausting his administrative remedies with respect to his RDAP claim. See 42 U.S.C. § 1997e(a). Plaintiff's RDAP claim, therefore, survives the PLRA's exhaustion requirement. See id.

There is no constitutional right to participate in prison drug rehabilitation programs. Saunders v. United States, No. 07-CV-3726 (ENV), 2007 WL 4264579, at *2 (E.D.N.Y. Nov. 30, 2007) (citing Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976)). As District Judge Vitaliano specifically held in Saunders, there is no constitutional right to participate in the RDAP program. See id. Hollman's claim, to the extent that it is based on an alleged constitutional right to rehabilitation, therefore, fails to state a claim upon which relief can be granted.

---

[5] While Defendants assert that Hollman failed to exhaust his RDAP claim after the issue was remanded to FCI Elkton, Plaintiff has not named any FCI Elkton employees as Defendants in this action. All Defendants are, or were during the relevant period, employees of MDC Brooklyn. (See Defs. Rule 56.1 Stmt. ¶¶ 4-10.)

Second, whether a prisoner's purported liberty interest is recognized for the purposes of procedural due process is determined by a two-part test established by the Supreme Court in Sandin v. Conner, 515 U.S. 472, 484 (1995). See Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000). The prisoner must establish (1) an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," Sandin, 515 U.S. at 484, and (2) that "the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996). Gomez, 202 F.3d at 597; see also Tellier v. Fields, 280 F.3d 69, 84-85 (2d Cir. 2000) (applying Sandin's two-part analysis to Bivens claims).

Under Sandin's second prong, the due process clause does not protect a liberty interest in RDAP's one-year sentence reduction. See Hickerson v. Willingham, No. 06-CV-777(CFD), 2006 WL 3422186, at *3 (D. Conn. Nov. 28, 2006) (citing Jacks v. Crabtree, 114 F.3d 983, 986 n. 4 (9th Cir. 1997) (rejecting claimed liberty interest in RDAP's one-year sentence reduction because the statute is not written in mandatory language and because denial of a reduction is not an atypical and significant hardship). Hollman's Complaint, therefore, fails to state a claim to the extent that it claims a constitutionally protected liberty interest in RDAP's sentence reduction.[6]

---

[6] In his opposition brief, Hollman further claims that he is entitled to relief pursuant to the Rehabilitation Act for denial of admission to RDAP. (See Pl. Mem. 4-5.) The Rehabilitation Act prohibits discrimination on the basis of disability "under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). "Congress has not waived the Federal Government's sovereign immunity against awards of money damages for § 504(a) violations, except where a federal agency is acting as a "'Federal provider' of financial assistance." Sarvis v. U.S., 2000 WL 1568230, at *2 (2d Cir. 2000) (summary order) (citing Lane v. Pena, 518 U.S. 187, 193 (1996). The Rehabilitation Act's waiver is limited to "the funding activities" of federal providers. Lane, 518 U.S. at 195. Because the Bureau of Prisons was not acting as a "Federal Provider" in denying Hollman admission to the RDAP program, his claim under the Rehabilitation Act is barred by sovereign immunity. See Sarvis, 2000 WL 1568230, at *2 (affirming dismissal of prisoner's Rehabilitation Act claim against Bureau of Prisons, under sovereign immunity for, inter alia, denying prisoner admission to a prison program).

For these reasons Hollman's RDAP claim is dismissed in its entirety for failing to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6).

## C. Plaintiff's Administrative Segregation Claim

In his second cause of action, Hollman claims that Defendants Bartlett and Guimond committed the intentional tort of placing him in the "hole," and depriving him of his right to be free from such restraint while inside prison. (Compl. ¶ 14.) Because Hollman states in his Complaint that this court has subject matter jurisdiction under Bivens, this court construes his "intentional tort" claim as a constitutional tort cognizable under Bivens, rather than a state law tort.

Defendants move for dismissal or, in the alternative, summary judgment on multiple grounds including, (i) failure to exhaust administrative remedies, (ii) failure to state a claim (iii) Defendants lack of personal involvement in any alleged violation, and (iv) qualified immunity.

### i. Exhaustion of Administrative Remedies

Before a prisoner brings an action under federal law concerning his prison conditions, the Prison Litigation Reform Act ("PLRA") requires that the prisoner first exhaust all available administrative remedies. See 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Exhaustion under the PLRA is an affirmative defense and not a jurisdictional bar. Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004).

In Hemphill v. New York, 380 F.3d 680 (2d Cir. 2004), the Second Circuit outlined a three-part test defining the scope of the PLRA's exhaustion requirement:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner.

18

The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

Hemphill, 380 F.3d at 686 (internal citations and quotation marks omitted). District courts in this circuit have held that "where a prisoner has made a 'reasonable attempt' to file a grievance, and prison officials have prevented the prisoner from filing that grievance, the grievance procedures are not 'available' to the [prisoner], and thus the [PLRA] does not preclude the prisoner from suing in federal court." Enigwe v. Zenk, No. 03-CV-854 (CBA), 2006 WL 2654985, at *3 (E.D.N.Y. Sept. 15, 2006) (quoting Thomas v. N.Y. State Dept. of Corr. Servs., Civ. No. 00-7163, 2002 WL 31164546, at *3 (S.D.N.Y. Sept. 30, 2002)).

Defendants argue that Hollman's cause of action, challenging his administrative segregation, is barred by the PLRA because Hollman did not pursue any administrative remedies before filing this lawsuit. Hollman concedes that he never filed an Administrative Remedy Request, Form BP-9. (See Pl. Mem. 3.) The parties dispute, however, whether Defendants prevented Hollman from exhausting available administrative remedies. Hollman asserts that he unsuccessfully attempted to obtain a Form BP-9 from his unit team, including Defendants Page, Waller, and Anderson. (See Pl. Mem. 3.) Hollman asserts that Defendants thwarted his pursuit of administrative remedies by "refus[ing] to attend [him] when [he] requested a BP 9 for being locked up in the 'hole' for nothing." (Hollman Aff. ¶ 6.) Defendants argue that Hollman's assertions are without merit because Hollman submitted at least four administrative grievances

related to other issues between November 1, 2007 and January 7, 2008, while Hollman was in the Special Housing Unit. (See Johnson Decl., Ex. 12.)

There are insufficient facts in the record to determine whether MDC's administrative appeals were "available" to Hollman. Whether Hollman made a "reasonable attempt" to file a grievance and to what extent, if any, Defendants prevented Hollman from filing a grievance is an issue of fact that this court cannot resolve at this stage of the litigation. Hollman states in his affidavit that Defendants Page, Waller and Anderson refused to provide him a requested Form BP-9. (Hollman Aff. ¶¶ 5-6.) Notes from a psychological consultation while in administrative segregation indicate that Hollman attempted to challenge his confinement. (See Defs. Rule 56.1 Stmt. ¶ 71; Johnson Decl. ¶ 75 & Ex. 27.) In response, the Defendants who allegedly placed Hollman in administrative segregation have not provided any affidavits supporting their contention that administrative grievance forms were available to Hollman. That Hollman submitted grievance forms for other issues during the periods he was in administrative segregation does not, by itself, foreclose a genuine issue of material fact regarding Hollman's ability to exhaust available administrative remedies in challenging his placement in administrative segregation.

    ii.    <u>Hollman States a Claim</u>

A prisoner claiming procedural due process violations arising from being placed in segregated confinement must establish "a protected liberty interest in not being confined" and, if so, whether "deprivation of that liberty interest occurred without due process of law." <u>See</u> <u>Sealey v. Giltner</u>, 116 F.3d 47, 51 (2d Cir. 1997.) Following the Supreme Court's decision in <u>Sandin</u>, whether a plaintiff has a protected liberty interest in not being confined requires a two-part analysis. <u>Tellier</u>, 280 F.3d at 80 (internal citations and quotation marks omitted); <u>see</u>

Sandin, 515 U.S. at 484. A prisoner has a liberty interest only if (i) the deprivation is atypical and significant and (ii) the state has created the liberty interest by statute or regulation. Tellier, 280 F.3d at 80.

Whether a prisoner's confinement is atypical and involves significant hardship involves factual determinations. Id. A district court must "examine the conditions of confinement in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." Davis v. Barrett, 576 F.3d 129, 134 (2d Cir. 2009) (internal quotation marks omitted). "Factors relevant to determining whether the plaintiff endured an atypical and significant hardship include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." Id. at 133 (internal quotation marks omitted). Atypicality of confinement can be resolved as a matter of law only when conditions in confinement are uncontested. Id. at 134. "[D]isputes about conditions may not be resolved on summary judgment...." Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004) (citation omitted).

Addressing the critical duration component of a prisoner's confinement, the Second Circuit has developed further guidelines for district courts determine the factual finding necessary in deciding whether a confinement is atypical and involves a significant hardship. See Palmer, 364 F.3d at 64-65 (2d Cir. 2004). "Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required" to determine atypicality. Id. (citing Colon v. Howard, 215 F.3d 227, 232 (2d Cir. 2000)). "A confinement longer than an

intermediate one, and under 'normal [Special Housing Unit] conditions,' is 'a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." Id. (quoting Colon, 215 F.3d at 231). While the Second Circuit has held that confinement of less than 101 days of "normal" Special Housing Unit confinement does not meet the Sandin standard of atypicality, Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004) (citing Sealey, 197 F.3d at 589), abnormal or unusual conditions departing from "normal" confinement in the Special Housing Unit may cause periods of confinement of less than 101 days to be atypical and impose significant hardship.[7] See Palmer, 364 F.3d at 65.

a.  Atypical and Significant Hardship

Hollman's first period of segregation, from September 6, 2007 through September 19, 2007 was for a total of 13 days. The second period was for a total of 97 days, from October 25, 2007 through January 30, 2008. Hollman alleges that the first time he was placed into administrative segregation on September 6, 2007, no further reasons other than a "pending . . . SIS investigation" were given to him, in response to inquiries about why he was segregated. (Compl. ¶ 7.) Hollman alleges that the second time he was placed into administrative segregation on October 25, 2007 was in retaliation for filing for administrative remedies. (Pl. Mem. 7.) Hollman asserts that Defendants thwarted his ability to exhaust his administrative remedies by "thwarting his efforts to obtain a BP 9" Form. (See Pl. Mem. 3.) Hollman also claims that he was not given any hearings or any reasons justifying prolonged confinement.

---

[7] For the purposes of this Sandin inquiry, separate confinements in the Special Housing Unit should be aggregated together if they constitute "a sustained period of confinement." See Giano v. Selsky, 238 F.3d 223, 226 (2d Cir. 2001) (aggregating Special Housing Unit sentences when two periods of confinement were based on the same administrative rationale and the conditions of confinement were similar). The court does not decide whether Hollman's two periods of confinement should be aggregated because it cannot conclude that the facts and circumstances surrounding Hollman's 97-day confinement by themselves do not constitute an atypical and significant hardship as a matter of law.

Defendants claim that the first period of confinement was imposed pending an investigation into whether Hollman violated Bureau of Prison regulations is not supported by the current record. The only evidence Defendants have provided is the administrative detention order stating that Hollman was placed in administrative detention pending an investigation into a violation of Bureau regulations. (See Johnson Decl. ¶ 68 & Ex. 24.) Defendants have not provided documentation showing which prison regulation Hollman violated or any documentation of the investigation or its outcome. Nor do Defendants provide any affidavits detailing the facts and circumstances of the violation or the conditions of Hollman's first segregation.

According to Defendants, Hollman's second confinement was imposed in response to another inmate's accusation that Hollman threatened him. While Defendants provide a copy of a redacted prison investigation report of the incident, the report does not support all of Defendants' contentions. Both Defendants' Local Rule 56.1 Statement and the prison report state that Hollman and the accusing inmate were placed into Special Housing in response to the accusation, but the prison report contradicts this claim in stating that the other inmate was never placed in Special Housing. (Compare Defs. Rule 56.1 Stmt. ¶ 72, Johnson Decl. Ex. 26 at 2, with Johnson Decl., Ex. 26 at 4.) The report specifically states that a prison camera system did not capture any corroborating evidence of the inmate's accusation.

Hollman's second confinement for 97 days is only four days short of this Circuit's 101-day trigger for detailed record development. The record does not include any information about the conditions of Hollman's confinements and to what extent those conditions differ from routine prison conditions, other than the alleged lack of available administrative grievance forms. Hollman's assertions about Defendants' acts and omissions and about his denial of process,

23

coupled with the lack of record support for Defendants' contentions, raise questions about the conditions of Hollman's confinement that preclude this court from denying Hollman the opportunity to collect evidence supporting his claims and deciding whether his confinement was atypical as a matter of law.

  b. State-Created Liberty Interest

  Federal Bureau of Prison regulations governing administrative detention establish Sandin's second requirement of a state-created liberty interest. Section 541.22 of the Code of Federal Regulations governs the circumstances and procedures that federal prisons follow when confining inmates in a special housing unit for administrative detention. See 28 C.F.R. § 541.22. The Second Circuit has held that mandatory language in § 541.22(c) creates a constitutionally protected liberty interest in not being confined. See Tellier, 280 F.3d at 81. Subsection (c) requires, inter alia, that prison staff provide inmates in administrative segregation a formal hearing, should they be confined for more than seven continuous days; they also provide that an inmate be released from segregation when the reasons for the placement in segregation cease to exist. See 28 C.F.R. § 541.22(c).

  Hollman has adequately alleged that Defendants deprived him of his liberty interest created by § 541.22(c) without due process of law. He claims that he was confined for 13 and 97 days; that "there had been no shots written, no hearing held, and no reason given" for his first detention; and that "there was a contrived reason given (but still no shot [sic] and no hearing held) . . . " for his second detention. (Pl. Mem. 8.) The procedures Hollman alleges Defendants denied him are precisely the procedures mandated by § 541.22(c).

  Accordingly, Hollman has stated a violation of his constitutionally protected state-created liberty interest.

Defendants' submissions accompanying their Motion for Summary Judgment fall short of foreclosing a genuine issue of material fact as to whether Hollman's liberty interest was violated. While Defendants have submitted evidence that psychological consultations mandated by § 541.22(c) were provided, Defendants have submitted no affidavits, documents, or other statements addressing whether Hollman was ever given any hearing while he was in confinement or whether the reason for his segregation continued to exist throughout the entire periods of segregation. Accordingly, Defendants motion for summary judgment on the grounds that Hollman fails to state a constitutional deprivation under <u>Bivens</u> is denied.

### iii. Personal Involvement of Defendants

In a <u>Bivens</u> action, a plaintiff must allege that the defendants were personally involved in the alleged constitutional violation. <u>Thomas v. Ashcroft</u>, 470 F.3d 491, 496 (2d Cir. 2006). In his Complaint, Hollman alleges that Defendants Page, Waller, and Anderson colluded with Defendant Bartlett to place him in administrative segregation. (Compl. ¶¶ 7-8.) Hollman also alleges that Defendant Guimond was enlisted by this conspiracy to place Hollman in administrative segregation for a second time. (<u>Id.</u> ¶ 8.) However, Hollman brings his second cause of action against only Defendants Bartlett and Guimond who, allegedly, "commited [sic] intentional tort by placing plaintiff in the 'hole,' and depriving him of his right to be free from such restraint even while inside prison." (Compl. ¶ 14.)

In support of this claim, Hollman states that Defendants Bartlett and Guimond put him in administrative segregation for no reason but to deter him from continuing to fight for his rights. (<u>See</u> Hollman Aff. ¶ 5.) Defendant Bartlett signed an administrative detention order placing Hollman into segregation for his first period of detention. (<u>See</u> Johnson Decl. Ex. 24, at 1.) At

this stage in the litigation, Hollman's allegations and assertions sufficiently allege personal involvement of Defendants Bartlett and Guimond.

     iv.    <u>Qualified Immunity</u>

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense which is "an immunity from suit rather than a mere defense to liability…it is effectively lost if a case is erroneously permitted to go to trial." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (emphasis omitted).

A government official claiming qualified immunity must establish either that "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." <u>Tierney v. Davidson</u>, 133 F.3d 189, 196 (2d Cir. 1998) (internal quotation marks omitted). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." <u>Id.</u> (internal quotation marks omitted). This test is "assessed in light of the legal rules that were clearly established at the time [the action] was taken." <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987).

A district court deciding a question of qualified immunity faces two issues. "[A] court must decide whether the facts that a plaintiff has alleged (<u>see</u> Fed. R. Civ. P. 12(b)(6), (c)) or shown (<u>see</u> Rules 50, 56) make out a violation of a constitutional right." <u>Pearson v. Callahan</u>, ---U.S.---, 129 S.Ct. 808, 815-16 (2009) (citations omitted). Second, "the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct." <u>Id.</u> at 816. A court may decide either of these issues first. <u>Id.</u> at 822.

Whether qualified immunity applies should be resolved at the earliest possible stage in litigation. See Hunter v. Bryant, 502 U.S. 224, 227 (1991). Qualified immunity "often can and should be decided on a motion for summary judgment." Castro, 34 F.3d at 112. However, summary judgment may not be appropriate if there are outstanding factual disputes in an inadequate record. See Anderson v. Creighton, 483 U.S. 635, 646-47 n.6 (1987) (noting that discovery specifically tailored to the question of qualified immunity may be necessary before summary judgment); Castro, 34 F.3d at 112.

The Second Circuit has held that a prisoner's procedural due process rights in the Bureau of Prison's adherence to the requirements of 28 C.F.R. § 541.22(c) are clearly established. See Tellier, 280 F.3d at 84. Tellier denied summary judgment to prison officer who held an inmate in administrative segregation for 514 days without affording the inmate the procedural protections required by §541.22. Id. at 86. On the issue of objective reasonableness, Tellier held that "it is simply unreasonable for any official to believe that a continuing violation of 514 days without a required hearing was permitted by Section 541.22." Id. at 85 ("The principle established in [Wright v. Smith, 21 F.3d 496, 500 (2d Cir.1994)] that a period of 67 days in SHU without hearings when such hearings were required by regulation at 14 days violates due process-surely applies a fortiori in this case."). However, the court also noted that had the defendant's confinement been for a brief period without a required hearing it "might be inclined to agree that no objectively reasonable officer could have known that such a minor infraction constituted a violation of [plaintiff's] constitutional rights." Id. The court emphasized that it "will not confer immunity on any official who glaringly disregards the very regulations that he or she is entrusted to discharge dutifully and in good faith." Id. at 86.

27

In this case, Hollman has alleged two periods in segregative confinement without a hearing that are significantly shorter than Tellier's 514 days of confinement without a hearing. See id. at 85. While the Second Circuit has made clear that the procedures mandated by § 541.22(c) constitute clearly established law for the purposes of qualified immunity and that no reasonable officer would believe that holding an inmate in confinement without a hearing for 514 days is permitted by § 541.22(c), this court cannot determine—at this stage of the litigation— whether Defendants had a reasonable belief that holding Hollman in confinement without a hearing for 13 and then 97 days without a hearing was not a violation of § 541.22(c). It may well be that Defendants' are ultimately entitled to qualified immunity on Hollman's claims. However, this court cannot decide whether it was objectively reasonable for Defendants "to believe that [their] action[s] did not violate such law" when the record does not indicate what actions they took or failed to take. See Tierney, 133 F.3d 196. Again, Defendants have submitted no affidavits, documents, or unsworn statements addressing whether Hollman was ever given a hearing after more than seven days in confinement or whether the reason for his segregation continued to exist throughout the entire periods of segregation.

This court is sensitive that qualified immunity is "an immunity from suit rather than a mere defense to liability…[and] it is effectively lost if a case is erroneously permitted to go to trial," Mitchell, 472 U.S. at 526, and that whether qualified immunity applies should be at the earliest stage in litigation, see Hunter, 502 U.S. at 227. Nonetheless, there are outstanding questions of fact in this record that prevent granting Defendants qualified immunity as a matter of law on summary judgment. For these reasons, the court refers this issue to Magistrate Judge Bloom to conduct limited discovery tailored to the question of whether Defendants' acts or omissions are entitled to qualified immunity.

## III.    CONCLUSION

For the foregoing reasons, Hollman's RDAP claim is dismissed for failing to state a claim upon which relief can be granted.  Hollman's administrative detention claim against Defendants Bartlett and Guimond survives Defendants' motion for summary judgment and is referred to Magistrate Judge Bloom for limited discovery on the issues of whether the PLRA's exhaustion requirement bars Hollman's claims and whether Defendants Bartlett and Guimond are entitled to qualified immunity.


SO ORDERED.

                                                        s/Nicholas G. Garaufis

Dated: Brooklyn, New York                       NICHOLAS G. GARAUFIS
          September 23, 2009                     United States District Judge